FILED

2023 Jan-20  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| MANSELL AND ASSOCIATES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No.  3:22-cv-01169-HNJ |
| RITCHEY METALS COMPANY, INC., | ) ) ) | |
| Defendant. | ) ) | |

## <u>MEMORANDUM OPINION</u>

This diversity action proceeds before the court on Defendant Ritchey Metals Company, Inc.'s ("Ritchey), motion to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6), respectfully.  (Doc. 11).  Alternatively, Ritchey moves the court to transfer this action to the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).  (*Id*.).  Plaintiff Mansell and Associates, LLC ("Mansell"), filed a motion pursuant to the equitable first-filed rule for the court to stay, or alternatively transfer to this court, a civil action between the parties pending in the Western District of Pennsylvania.  (Doc. 15).

Review of the parties' motions and contentions result in the following conclusions:  the court maintains specific personal jurisdiction over Ritchey, Mansell

states a justiciable claim pursuant to the Declaratory Judgment Act, the Northern District of Alabama qualifies as a proper venue, yet, the court will dismiss this action pursuant to the court's discretion regarding declaratory judgment actions, an exception to the first-filed rule, and the § 1404(a) venue factors.

For the foregoing reasons, the court will **DENY** Ritchey's motions to dismiss and transfer this case.  (Doc. 11).  Moreover, the court will **DENY** Mansell's motion to stay, or alternatively, transfer the Western District of Pennsylvania case to this district.  (Doc. 15).  Rather, the court will **DISMISS** this case without prejudice.[1]

## BACKGROUND

Mansell, an Alabama limited liability company, maintains its principal place of business in Colbert County, Alabama.  (Doc. 9 at ¶ 5).  Ritchey, a Pennsylvania corporation, maintains its principal place of business in Pennsylvania.  (*Id.* at ¶ 6).  In August 2018, Ritchey determined it needed an aluminum-melting furnace for its main operating plant in Canonsburg, Pennsylvania.  (Doc. 9-2 at 2).[2]  To obtain such a furnace, Ritchey actively solicited quotes from various manufacturers.  (*Id.*).  In

---

[1] After removing this case from state court, Ritchey filed a motion to dismiss Mansell's original complaint on September 19, 2022.  (Doc. 3).  Subsequently, Mansell filed an amended complaint on October 4, 2022, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).  (Doc. 9).  Thus, the court finds Ritchey's original motion to dismiss **MOOT**.  *Gresham v. Waffle House, Inc.*, 586 F. Supp. 1442, 1444 n.1 (N.D. Ga. 1984) ("Defendant's motion to dismiss plaintiff's original complaint became moot upon plaintiff's filing of an amended complaint as a matter of course during the pendency of the motion." (citing Fed. R. Civ. P. 15(a))).

[2] Mansell attached two documents to its amended complaint.  (Docs. 9-1, 9-2).  "A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss."  *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) (citing *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009)).

particular, Ritchey solicited Mansell for a quote to provide a furnace.  (Doc. 9 at ¶ 4; Doc. 9-2 at 2).

In a series of conversations, a Mansell representative highlighted both its experience in building aluminum-melting furnaces and its expertise in designing and installing such furnaces at facilities similar to Ritchey's factory.  (Doc. 9-2 at 2-3). Ritchey invited the Mansell representative to conduct a diligence visit at its facility in September 2018.  (*Id.* at 3).  During the diligence visit, the Mansell representative walked the facility, took measurements, examined the area where the furnace would operate, and met with several Ritchey employees and agents.  (*Id.*).  The Mansell representative conducted a second diligence visit in Fall 2020.

At some point after the parties commenced contract negotiations for the manufacture of the furnace, two Ritchey representatives visited Mansell's facility in Alabama to inspect a furnace built for another customer.  (Doc. 9 at ¶ 4).  While in Alabama, one of the representatives continued contract negotiations with Mansell personnel for the manufacture, delivery, and installation of the furnace.  (*Id.*).

Subsequently, Mansell sent Ritchey a proposal titled, "QUOTE No. 102620" ("Contract"), and dated October 26, 2022.  (Doc. 9 at ¶ 7; Doc. 9-1).  The Contract specified Mansell's expected performance and price.  (*See* doc. 9-1).  In addition, the Contract stated, on a page titled "ACCEPTANCE,"

> These specifications are submitted for the prompt consideration of the Buyer.  An authorized representative of the BUYER shall accept the same within ninety (90) days of the date of this proposal, at the proper place

indicated in the lower left hand corner.  It shall then be returned to Mansell and Associates for approval by M&A and upon such approval, it shall become a binding contract upon both parties hereto.

(*Id*. at 14).   The following two pages, titled "LEGAL CONDITIONS OF SALE," provided

> The foregoing Proposal by [Mansell] . . . is EXPRESSLY MADE CONDITIONAL upon the Terms and Conditions specified below COMPRISING THE TERMS AND CONDITIONS OF SALE OF THE ULTIMATE AGREEMENT BETWEEN [Mansell] and PURCHASER.
>
> . . .
>
> The accepted proposal shall not be binding upon M&A until it is ratified at its home office by a duly authorized officer or agent of M&A, providing an Order of Acknowledgment to Purchaser.

(*Id*. at 14-15).  The Contract also declared that it "shall be construed under the laws of Alabama."  (Doc. 9 at ¶¶ 1,4; Doc. 9-1 at 16).

A Ritchey representative signed the Contract on November 3, 2020, and then delivered it to Mansell in Alabama (presumably via electronic means).  (Doc. 9 at ¶ 4; Doc. 9-1 at 14).  A Mansell representative signed the Contract that same day.  (Doc. 9-1 at 14).

The design and manufacturer of the furnace at issue occurred in Alabama.  (Doc. 9 at ¶ 4).  During production, Mansell convened regular Zoom meetings, and engaged in numerous emails and telephone calls, with a Ritchey representative concerning the progress of the furnace.  (*Id*.).  On July 7, 2021, Mansell delivered the furnace to Ritchey at its designated facility in Pennsylvania.  (Doc. 9-2 at 3).

Some issues arose regarding the furnace which the parties attempted to resolve. (*See* doc. 9-2).  At Ritchey's facility, Mansell representatives "instructed and showed" Ritchey personnel in "detail" as to the proper operation and maintenance of the furnace.  (Doc. 9 at ¶ 13).  After the resolution efforts failed, Ritchey's legal counsel sent Mansell a demand letter on August 1, 2022, contending Mansell had breached the Contract and Ritchey had suffered damages as a result thereof.  (*See* doc. 9-2).  Ritchey's counsel requested Mansell representatives contact him prior to August 10, 2022, to discuss resolution options as a final effort to reach an amicable solution.  (*Id.* at 9-10).[3] The letter concluded that if Mansell "points fingers" or suggests "lame" defenses to justify its conduct, Ritchey would terminate "informal negotiations" and file a lawsuit against Mansell in the Western District of Pennsylvania.  (*Id.* at 10).

On August 12, 2022, Mansell filed a complaint in the Circuit Court of Colbert County, Alabama, against Ritchey seeking declaratory relief.  (Doc. 1 at 23-33).  Ritchey removed the case to this court on September 12, 2022.  (Doc. 1).   On September 19, 2022, Ritchey filed a motion to dismiss Mansell's complaint and filed its own complaint in the Western District of Pennsylvania against Mansell and Ed Mansell seeking appropriate damages and declaratory relief.  (Doc. 3); Complaint at 29, *Ritchey Metals*

---

[3] These dates reference the demand letter attached to Mansell's amended complaint.  (Doc. 9-2 at 2, 10).  Ritchey attached a nearly-identical copy of the demand letter to its Notice of Removal, yet it reflects a July 25, 2022, date, and it requests contact from Mansell by August 5, 2022.  (Doc. 1 at 13, 21).  The parties have not offered any explanations as to the discrepancies or otherwise alluded to them.  Because the discrepancies do not bear an effect upon the court's analyses, the court will rely upon Mansell's version of the letter given its status as the initial nonmovant.

*Company, Inc., v. Mansell and Associates, LLC, et al.*, 2:22-cv-01335-CCW, (Doc. 1).[4]
Ritchey avers the following counts in its complaint: breach of warranty, breach of
contract, fraud in the inducement, and negligence.  Complaint at 13-29, *Ritchey Metals
Company, Inc., v. Mansell and Associates, LLC, et al.*, 2:22-cv-01335-CCW, (Doc. 1).
On October 4, 2022, Mansell filed an amended complaint pursuant to Federal Rule of
Civil Procedure 15(a)(1)(B) seeking a declaratory judgment.  (Doc. 9).  As discussed
previously, Ritchey filed its motion to dismiss or transfer this civil action (doc. 11), and
Mansell filed a motion to stay or transfer the civil action in the Western District of
Pennsylvania due to the first-filed rule (doc. 15).

## DISCUSSION

## I. THE COURT MAINTAINS SPECIFIC JURISDICTION OVER RITCHEY

In the initial entreaty in its motion to dismiss, Ritchey argues that "the facts
alleged in [Mansell's] Amended Complaint are markedly insufficient – and indeed,
conclusively demonstrate – that this Court does not possess personal jurisdiction over
[it]."  (Doc. 11 at 4).  The following analysis reveals the court maintains specific
jurisdiction over Ritchey.

---

[4] A court "may take judicial notice of a document filed in another court 'not for the truth of the
matters asserted in the other litigation, but rather to establish the fact of such litigation and related
filings.'" *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (quoting *Liberty Mut. Ins. Co. v. Rotches
Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)).

The Supreme Court in *Pennoyer v. Neff* avowed as a matter of sovereignty that no State's judiciary "can extend its process beyond [its] territory so as to subject either persons or property to its decisions."  95 U.S. 714, 723 (1877), *overruled on other grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977) (citations omitted).  Hence, personal jurisdiction ensures "the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).[5]

The Supreme Court has since professed that

> [t]he requirement that a court have personal jurisdiction flows . . . from the Due Process Clause.  The personal jurisdiction requirement recognizes and protects an individual liberty interest.  It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) ("The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant.").

---

[5] In addition, the *Pennoyer* decision averred in dicta that "[s]ince the adoption of the Fourteenth Amendment to the Federal Constitution, the validity of such judgments may be directly questioned, and their enforcement in the State resisted, on the ground that proceedings in a court of justice to [determine] the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law."  *Pennoyer v. Neff*, 95 U.S. 714, 733 (1877), *overruled on other grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977); *see also* 4 Adam N. Steinman, Fed. Prac. & Proc. Civ. § 1064 (4th ed. April 2022 Update) (explaining the Supreme Court's discussion in *Pennoyer* regarding the due process clause "must be viewed as dictum" because the Fourteenth Amendment "did not become effective until after the [underlying] judgment had been rendered"); 16 Moore's Federal Practice - Civil § 108.11("Although *Pennoyer v. Neff* was a full faith and credit case, and, as a result, the Court's comments about due process were dicta, the case has been accepted as equating the jurisdictional requirements of full faith and credit with those of due process." (footnote omitted)).

To be sure, "the requirement of personal jurisdiction, as applied to state courts, reflects an element of federalism and the character of state sovereignty vis-à-vis other States." *Id.* at 702 n.10.   Nonetheless,

> [t]he restriction on state sovereign power . . . must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdiction requirement and the Clause itself makes no mention of federalism concerns. Furthermore, if the federalism concept operated as an independent restriction on the sovereign power of the court, it would not be possible to waive the personal jurisdiction requirement: Individual actions cannot change the powers of sovereignty, although the individual can subject himself to powers from which he may otherwise be protected.

*Id.*

Personal jurisdiction comprises "an essential element of the jurisdiction of a district . . . court," without which the court stands "powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (alteration in original) (internal quotation marks omitted) (quoting *Employers Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)).   "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (internal quotation marks omitted) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir.2009)).   "In doing so, [courts] accept as true the allegations in the complaint." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (citing *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006)); *see also Walden v. Fiore*, 571

U.S. 277, 279, 281 n.2 (2014) (per curiam) (accepting respondents' factual allegations as true at the motion-to-dismiss stage in assessing personal jurisdiction). Of course, a plaintiff cannot rely "solely on vague and conclusory allegations" to establish a prima facie case of personal jurisdiction. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217-18 (11th Cir. 1999) (per curiam)).

"A federal district court sitting in diversity may exercise personal jurisdiction to the extent authorized by the law of the state in which it sits and to the extent allowed under the Constitution." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002) (citations omitted); *see also Walden v. Fiore*, 571 U.S. 277, 283 (2014) ("[A] federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." (citing Fed. Rule of Civ. Proc. 4(k)(1)(A))). Accordingly, "[a] federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Diamond Crystal*, 593 F.3d at 1257-58 (internal quotation marks omitted) (quoting *United Techs.*, 556 F.3d at 1274). However, the two inquiries merge in this case because "Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible." *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922,

925 (11th Cir. 2007) (citing Ala. R. Civ. P. 4.2(b); *Sieber v. Campbell*, 810 So.2d 641, 644 (Ala. 2001)).

As emphasized previously, the "Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant." *Ford Motor*, 141 S. Ct. at 1024. "Although a nonresident's physical presence within the territorial jurisdiction of the court is not required [for the exercise of personal jurisdiction], the nonresident generally must have 'certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.''" *Walden*, 571 U.S. at 283 (alteration in original) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In giving content to that formulation, the [Supreme] Court has long focused on the nature and extent of 'the defendant's relationship to the forum State.'" *Ford Motor*, 141 S. Ct. at 1024 (quoting *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S.Ct. 1773, 1779 (2017)).

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *International Shoe*, 326 U.S. at 317). "Those claims need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world. But that breadth imposes a correlative limit: Only a select 'set of affiliations with a forum' will expose a defendant to such sweeping jurisdiction."

*Ford Motor*, 141 S. Ct. at 1024 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). Those limitations reflect "an individual is subject to general jurisdiction in her place of domicile." *Id.* (citing *Daimler AG*, 571 U.S. at 137). "And the 'equivalent' forums for a corporation are its place of incorporation and principal place of business." *Id.* (citing *Daimler AG*, 571 U.S. at 137, 139 n.19 (leaving open "the possibility that in an exceptional case" a corporation might also be "at home" elsewhere)).

"Specific jurisdiction, on the other hand, depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (alteration in original) (citations omitted). "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* (citation omitted).

As an initial matter, Ritchey undertook incorporation in Pennsylvania and maintains its principal place of business there as well. In addition, the amended complaint does not portray Ritchey otherwise maintains especial "continuous and systematic" contacts with Alabama such that the State's courts may exercise general in personam jurisdiction over it. *Goodyear*, 564 U.S. at 919 (2011) (citing *International Shoe*, 326 U.S. at 317). Therefore, the primary issue in this case concerns whether the court may exercise specific in personam jurisdiction over Ritchey.

As previously conveyed, specific jurisdiction "covers defendants less intimately connected with a State" than general jurisdiction. *Ford Motor*, 141 S. Ct. at 1024. "The

contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). This conception queries whether a defendant took "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Id.* at 1024-25 (first alteration in original) (internal quotation marks omitted) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The purposeful availment inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Walden*, 571 U.S. at 284 (internal quotation marks omitted) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). That is, "[f]or a State to exercise [specific] jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.*

The Supreme Court delineates two important, related aspects of this necessary relationship. *Id.* at 283-86. "First, the relationship must arise out of contacts that the 'defendant himself' creates with the forum State." *Id.* The Court has consistently "rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* at 284 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."); *Hanson v. Denckla*, 357 U.S. 235, 253-254 (1958) (determining a Florida court could not exercise personal jurisdiction

over a trustee in Delaware based solely upon the trust settlor's domiciliary in the state and its execution of appointment powers there); *World-Wide Volkswagen*, 444 U.S. at 298 (holding Oklahoma courts could not exercise personal jurisdiction over an automobile distributor that supplied New York, New Jersey, and Connecticut dealers based only upon an automobile purchaser's act of driving the automobile on Oklahoma highways)).  "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'"  *Id.* at 285 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

Second, the "minimum contacts" analysis must proceed upon a "defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Id.* (citations omitted).  That is, "the plaintiff cannot be the only link between the defendant and the forum," and thus, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Id.* at 285-86 (citation omitted); *see also Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.").  Rather, the Due Process Clause "requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."  *Id.* (quoting *Burger King*, 471 U.S. at 475).

Nevertheless, "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

Therefore, a defendant's contacts must depict the "defendant deliberately 'reached out beyond' its home—by, for example, 'exploiting a market' in the forum State or entering a contractual relationship centered there." *Ford Motor*, 141 S. Ct. at 1025 (cleaned up) (quoting *Walden*, 571 U.S. at 285). "And although physical presence in the forum is not a prerequisite to jurisdiction, [*Burger King*, 471 U.S. at 476,] physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden*, 571 U.S. at 285 (citing *Keeton*, 465 U.S. at 773-774).

As an additional requirement, the plaintiff's claims must "'arise out of or relate to the defendant's contacts' with the forum." *Ford Motor*, 141 S. Ct. at 1025 (quoting *Bristol-Myers*, 137 S. Ct. at 1780). "Or put just a bit differently, 'there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (cleaned up) (alteration in original) (quoting *Bristol-Myers*, 137 S. Ct. at 1780). Once a plaintiff has established the "minimum contacts" necessary to create specific jurisdiction and a sufficient nexus between those contacts and the litigation, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Diamond Crystal*,

593 F.3d at 1267 (quoting *Burger King*, 471 U.S. at 475) (citing *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 858-59 (11th Cir. 1990)).

The foregoing exposition distills into a three-part, due process test for specific in personam jurisdiction cases: "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (footnote and citations omitted).

### A. Ritchey's Contacts with the State Establish the Purposeful Availment Necessary for the Court's Exercise of Specific Jurisdiction

As the ensuing analysis reveals, Ritchey's contacts with Alabama reflects it purposely availed itself of the privilege of conducting affairs in the State.  This case revolves around Mansell's entreaty for "the Court [to] declare the rights, status, and other legal relations of Mansell and Ritchey" under the Contract they executed.  (Doc. 1 at ¶ 24).  As examined previously, "entering a contract with a citizen of another state, standing alone, does not automatically satisfy the minimum contacts test." *Diamond Crystal*, 593 F.3d at 1268 (citing *Burger King*, 471 U.S. at 478).  Rather, "when inspecting a contractual relationship for minimum contacts," the court must "follow a 'highly realistic approach' that focuses on the substance of the transaction: prior negotiations,

contemplated future consequences, the terms of the contract, and the actual course of dealing." *Id.* (quoting *Burger King*, 471 U.S. at 479).

Relevant factors for consideration include a defendant's conduct in "initiating the contractual relationship, visiting the plaintiff's factory to assess or improve quality, sending materials to the plaintiff for inspection or use in shipping, participating in the manufacturing process, establishing a relationship by placing multiple orders, requiring performance in the forum, [and] negotiating the contract via telefaxes or calls with the plaintiff." *Id.* at 1268-69 (footnotes omitted). The Eleventh Circuit labeled the foregoing considerations as "plus" factors that connect the defendant to the forum state's jurisdiction, thus evincing particular contacts with the state. *Id.* at 1268. The "plus" factors "are not talismans," but they "indicate that the defendant 'deliberate[ly] affiliat[ed]' with the forum . . . and thus should reasonably anticipate defending a suit there." *Id.* at 1269 (last alteration added) (quoting *Burger King*, 471 U.S. at 482).

Application of the afore-delineated principles portray Ritchey purposely availed itself of the Alabama forum via its contacts. First, the facts portray Ritchey initiated the contractual relationship by soliciting Mansell at its place of business to build the furnace. Ritchey's solicitation constitutes a factor evincing purposeful availment. *See Diamond Crystal*, 593 F.3d at 1268 n.24 (collecting cases that found minimum contacts existed where, *inter alia*, the defendant solicited the plaintiff's services). Ritchey argues the amended complaint cursorily averred it "'solicited' or initiated contact with

[Mansell] to purchase the Furnace in Alabama . . . ."  (Doc. 11 at 11).  Actually, the amended complaint appends Ritchey's demand letter, which provides,

> In August 2018, [Ritchey] was actively seeking to increase its productivity and abilities, and it desired to purchase a Furnace for use at its main operating plant located in Canonsburg, Pennsylvania . . . that had the precise ability to melt aluminum.  [Ritchey] spoke to and sought quotes from various manufacturers.  Mansell was one of the companies RMC spoke to during such process.

(Doc. 9-2 at 2).  Therefore, Ritchey's own correspondence buttresses the amended complaint's averment Ritchey solicited Mansell to construct the furnace.

As an additional objection, Ritchey "urges the Court to take judicial notice of the fact that [Mansell] advertised the Furnace on its website and deduce the logical inference that [it] was responding to [Mansell's] advertisement when it inquired into purchasing the Furnace."  (Doc. 11 at 13).  Federal Rule of Evidence 201 "provides for taking judicial notice of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonable be questioned."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).  Under Rule 201, "a court '*may* take judicial notice on its own' or '*must* take judicial notice if a party requests it and the court is supplied with the necessary information.'"  *Lodge v. Kondaur Cap. Corp.*, 750 F.3d 1263, 1273 (11th Cir. 2014) (emphasis in original) (quoting Fed. R. Evid. 201(c)).

Furthermore,

> a court has "wide discretion" to take judicial notice of appropriate adjudicative facts at any stage in a proceeding . . . .  *See* Fed. R. Evid. 201(d);

*Dippin' Dots, Inc. v. Frosty Bites Distribut., LLC,* 369 F.3d 1197, 1204-05 (11th Cir. 2004).  Nevertheless, the taking of judicial notice of facts is "a highly limited process."  *Dippin' Dots, Inc.,* 369 F.3d at 1205 (quotation marks omitted).  "The reason for this caution is that the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court."  *Id.* (quotation marks omitted).

*Lodge,* 750 F.3d at 1273.

Ritchey presented an internet link portraying that Mansell currently advertises furnaces on its website.  (Doc. 11 at 13 (citing https://www.mansellandassociates.net/)).  Importantly, however, that evidence by itself does not establish the link existed at the time Ritchey sought a furnace.  Furthermore, Ritchey did not provide an archived version of Mansell's webpage.  *See Pohl v. MH Sub I, LLC,* 332 F.R.D. 713, 716 (N.D. Fla. 2019) ("Numerous courts, including our sister courts, have taken judicial notice of web pages available through the WayBack Machine." (collecting cases)).  Therefore, the court declines Ritchey's judicial notice request in the absence of further information regarding the advent of the portrayed webpage.

As for a second contact supporting a finding of purposeful availment, two Ritchey representatives traveled to Alabama during the parties' contract negotiations to visit Mansell's facility and inspect a furnace built by Mansell for another customer.  *Diamond Crystal,* 593 F.3d at 1268 n.25 (collecting cases that found minimum contacts existed where, among other factors, the defendant's representatives visited "the plaintiff's factory to assess or improve quality"); *Borg-Warner Acceptance Corp. v. Lovett &*

18

*Tharpe, Inc.*, 786 F.2d 1055, 1058 (11th Cir. 1986) ("The fact that employees of [Defendant] entered Missouri to return the manufactured goods to Coon is jurisdictionally significant." (citing *Southwire Co. v. Trans-World Metals & Co.*, 735 F.2d 440, 442 (11th Cir. 1984))).

And while in Alabama, one of the Ritchey representatives negotiated the contract terms for the construction of the furnace, thus depicting further contacts with the forum.   Ritchey argues that Mansell's "vague and undetailed" allegation as to such negotiations during the visit does not establish personal jurisdiction, but the allegation does not merit such an observation given the logical inference the parties discussed the contract during Ritchey's visit to Alabama.  (Doc. 17 at 8).

As further evidence of jurisdictional contacts, the parties' Contract provided Alabama law governed its interpretation.  This circumstance buttresses the conclusion that Ritchey purposefully availed itself of Alabama.  *See Burger King*, 471 U.S. at 482 (finding a choice of law provision, among other factors, "reinforced [a defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"); *Gold Kist, Inc. v. Baskin-Robbins Ice Cream*, 623 F.2d 375, 381 n.4 (5th Cir. 1980) ("Additionally, the contract between Baskin-Robbins and Gold Kist contained a choice-of-law provision calling for the application of Georgia law. Such a provision is a purposeful availment of the benefits and protections of Georgia law, for it not only selects the Georgia rules of decision but also reposes trust in the legislature and courts of Georgia in wisely shaping the law during the entire period in which the contract is to

be in force.")[6]; *Sw. Offset, Inc. v. Hudco Pub. Co.*, 622 F.2d 149, 151-52 (5th Cir. 1980) (finding minimum contacts existed, among other factors, because the forum state's law governed the contracts).

To counteract the cogency of the choice-of-law clause, Ritchey cites two nonbinding cases positing that choice-of-law provisions in favor of the contested forum did not warrant the exercise of personal jurisdiction.  (Doc. 11 at 10).  Moreover, Ritchey contends "a contractual choice of law clause is entitled to very little weight in the personal jurisdiction calculus" because "choice of law analysis is distinct from minimum contacts analysis." (*Id.*).  Yes, choice-of-law doctrine constitutes a legal order distinct from personal jurisdiction, yet precedent in the personal jurisdiction arena still treat choice-of-law provisions as a relevant factor in the minimum contacts examination.  As countenanced by the Supreme Court in *Burger King*, a defendant "'purposefully availed himself of the benefits and protections of Florida's laws' by entering into contracts expressly providing that those laws would govern franchise disputes," along with a 20-year interdependent relationship the defendant enjoyed with the plaintiff in the forum State.  471 U.S. at 482 (footnote and citation omitted).  As the Court discerned, although a choice-of-law provision in a contract, standing alone, does not suffice to confer jurisdiction in a forum, courts cannot ignore such provisions in

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

determining whether a defendant has purposefully invoked the benefits and protections of a state's law. *Id.*

As an additional indicium of purposeful availment, Ritchey returned the Contract to Alabama for its final execution. This conduct embodies Ritchey's endeavor to facilitate formation of the Contract by effecting delivery of it to the State. *Sw. Offset*, 622 F.2d at 151-52 (finding minimum contacts existed where, among other factors, the execution of all the contracts, except one, took place in the forum state); *cf. Borg-Warner*, 786 F.2d at 1062 n.4 (labeling the execution of a contract in a forum state as a minor factor). Ritchey contends it "did not conduct official acceptance of the [Contract] in . . . Alabama" and that "the contract was not officially formed or executed in Alabama . . . ." (Doc. 11 at 9, 15). Although Ritchey may have signed the Contract in Pennsylvania, the execution of the Contract did indeed take place in Alabama. The Contract stated it would become binding on the condition that Mansell approved and ratified it after Ritchey's acceptance, indicating Ritchey knew the Contract would be executed in Alabama based on its language.[7] Therefore, after Ritchey signed and

---

[7] The parties did not consummate the contract until its execution in Alabama:

> A signature on a contract may be required . . . by an agreement that the contract will not be binding until it is signed. Where the parties know that the execution of a written contract is a condition precedent to their being bound, there can be no binding contract until the written agreement is executed, even if all the terms have been agreed on. A contract may be signed on condition that it shall not take effect until others have signed it. . . .

> [FN 1] . . . . To make a signature a condition precedent to enforcement of a contract, . . . the agreement must clearly and explicitly require a signature before it becomes binding. . . .

delivered the Contract to Mansell in Alabama, Mansell performed the last essential act of formation by signing it. *Browning Enter., Inc. v. Rex Iron & Mach. Prod. Co.*, 504 F. Supp. 2d 1217, 1226 (N.D. Ala. 2007) ("A contract is . . . 'made' in the state in which the last act essential to execution of the contract took place." (citing *Ideal Structures Corp. v. Levine Huntsville Dev. Corp.*, 396 F.2d 917, 923-25 (5th Cir. 1968))). That is, Ritchey's delivery of the Contract with its approval enabled the final act in Alabama to form a contractual relationship involving Ritchey. Thus, the court not only finds that the execution of the Contract took place in Alabama; Ritchey's signing and delivery of the agreement also engendered a contractual relationship effectuated in Alabama.

Finally, Ritchey mailed payments to Alabama and regularly communicated with Mansell via Zoom, telephone, and email regarding work progress. These acts also constitute contacts evincing purposeful availment. *See Power Guardian, LLC v. Directional Energy Corp.*, 904 F. Supp. 2d 1313, 1322 (M.D. Ga. 2012) (finding minimum contacts existed where, among other circumstances, "after being paid, [the defendant] continued its contacts with Georgia through email communications with the Plaintiff regarding performance of the contract"); *cf. Borg-Warner*, 786 F.2d at 1062 n.4 (labeling the "use of interstate communications and the mails" as minor factors).

Mansell's allegations establish that Ritchey effected minimum contacts with Alabama. The court understands that some of the aforementioned factors carry more

---

17A Am. Jur. 2d Contracts § 174 (other footnotes and citations omitted).

weight than others, and that each factor standing alone may not support a finding of minimum contacts. Yet, when considering all the factors together, Ritchey purposely availed itself of the privileges and protections of Alabama via its contacts with the forum. *See Comm'n Equip. & Contracting Co. v. Municipality of Anchorage, Alaska*, 498 F. Supp. 632, 635 (M.D. Ala. 1980) (considering totality of alleged contacts when assessing specific personal jurisdiction); *see also King & Hatch, Inc. v. S. Pipe & Supply Co.*, 435 F.2d 43, 46 (5th Cir. 1970) ("Taken collectively, the contacts of [the nonresident defendant] with the State of Alabama far exceed those 'minimum contacts' which would allow Alabama to constitutionally compel [the defendant] to defend this suit in the forum state.").

The parties tendered several decisions to support their respective positions regarding the personal jurisdiction issue. Of course, "each case must be decided on its own facts," but "guiding principles may be found in the facts of other cases." *Sw. Offset*, 622 F.2d at 151 (citations omitted). Nonetheless, none of the decisions provided any direct corollary with the circumstances of this case, in particular the decisions relied upon by Ritchey.

To wit, the decision in *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, assesses whether a "one-time purchaser of goods from a seller in [a] forum state can[ ] be constitutionally subject to the exercise of personal jurisdiction by the courts of the forum state." 786 F.2d 1055, 1059 (11th Cir. 1986). In *Borg-Warner*, Lovett & Tharpe, a Georgia corporation, contracted with Coon Manufacturing and Distribution, a

Missouri proprietorship, for Coon to manufacture and sell merchandise to Lovett & Tharpe.  786 F.2d at 1056.  The parties' negotiated and entered their contract in Georgia, and no Lovett & Tharpe employees visited Missouri to negotiate the contract or to inspect Coon's manufacturing plant.  *Id.*  Coon manufactured the merchandise in Missouri and transported it to Georgia.  *Id.*  Lovett & Tharpe subsequently returned some of the goods to Coon in Missouri, occasioning the entrance of one or more of Lovett & Tharpe's employees into Missouri.  *Id.*  After Lovett & Tharpe refused to pay for the returned merchandise, Borg-Warner filed suit against Lovett & Tharpe in Missouri.  *Id.*[8]

In the *Borg-Warner* decision, the Court determined that although "a post-contract execution contact with the state is relevant in determining whether an exercise of personal jurisdiction is proper," "binding precedent in [the Eleventh Circuit] indicates that a purchaser in an isolated transaction may not be subject to personal jurisdiction in a seller's state merely because the manufacturer performed its duties under the contract there."  *Id.* at 1063 (citations omitted).  With support from several out-of-circuit decisions, the *Borg-Warner* court held "that the isolated contact with Missouri made by Lovett & Tharpe employees was an ancillary factor, which, considered in conjunction

---

[8] Borg-Warner, a Delaware corporation, assumed party status because it "agreed to loan Coon money with which Coon could finance its manufacturing of the merchandise to be purchased by Lovett & Tharpe . . . ."  *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1056 (11th Cir. 1986).

with Coon's performance of its contract obligations in Missouri was insufficient to constitutionally permit exercise of personal jurisdiction over Lovett & Tharpe." *Id.*

The court finds *Borg-Warner* distinguishable on the following bases: the one-time transaction in the case involved a purchase of commercial goods, not a contract for the manufacture, delivery, and installation of an industrial furnace as in this case, *c.f.*, *Aflac, Inc. v. SDT Air, LLC*, 978 F. Supp. 2d 1304 (M.D. Ga. 2013) (concluding that a Texas defendant established minimum contacts with Georgia in dispute involving a single transaction of an aircraft); the decision does not indicate Lovett & Tharpe solicited Coon's business, unlike the circumstances at bar; the agreement in *Borg-Warner* did not express a forum selection clause in favor of Missouri; Ritchey delivered the Contract to Mansell in Alabama for execution, unlike the defendant in *Borg-Warner*; and Ritchey mailed payments to Alabama and regularly communicated with Mansell via Zoom, telephone, and email regarding work progress, unlike the defendant in *Borg-Warner*.

Ritchey posits *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir. 1983), as an additional comparison for this action. (Doc. 11 at 6-9). In *Hydrokynetics*, the Fifth Circuit concluded defendant Alaska Mechanical "did not purposefully avail itself of the privilege of conducting business within Texas or invoke the benefits and protections of Texas law":

> Although [Alaska Mechanical] did agree to purchase goods which it knew were to be manufactured by Hydrokinetics in Texas, no performance by Alaska Mechanical was to take place in Texas, other than perhaps the payment for the goods. [The Court] [did] not believe that the unilateral activity of Hydrokinetics in Texas satisfie[d] the requirement of contact

between Alaska Mechanical and the state of Texas. . . .  Nor [did] [the Court] weigh heavily the fact that Alaska Mechanical may have mailed payment checks into the forum state in exchange for the goods. . . .  Yet [the Court] [did] consider significant that only a single transaction [was] involved in this case, governed by Alaska law, which [was] the defendant's sole contact with the forum state.  The only performance in Texas was that of the plaintiff, with delivery by Hydrokinetics taking place in the state of Washington.  As for the exchange of communications between Texas and Alaska in the development of the contract, that in itself [was] also insufficient to be characterized as purposeful activity invoking the benefits and protections of the forum state's laws. . . .  That officers of Alaska Mechanical twice traveled to Texas to inspect Hydrokinetics's facilities and to resolve the dispute between the parties [was] relevant, but in this case [the Court] [did] not find it [was] sufficient to alter the basic quality and nature of Alaska Mechanical's contact with the state of Texas.  Although the bargain may have been cemented in Texas when Hydrokinetics accepted Alaska Mechanical's offer, the significance of that [was] diminished by the provision specifying that the agreement be governed and construed according to the laws of the state of Alaska.  [The Court] [did] not hold that the facts relied on by Hydrokinetics in support of its contention that the district court in Texas [had] jurisdiction over the person of the defendant [were] not relevant to the determination; [it] merely conclude[d] that, considering the totality of the facts of [the] case, the necessary inference of purposeful availment [was] not supported.

*Id.* at 1029-30 (footnote and citations omitted).

Setting aside the observation *Hydrokinetics* does not serve as binding precedent for this court, it displays features distinguishing it from the dispute at bar.  To be sure, there exist some congruences between the circumstances in this case and those reviewed in *Hydrokinetics*:  Ritchey did not have a contractual obligation to perform in Alabama besides tendering payments; only a single transaction occurred; only Mansell contractually performed in Alabama, and subsequently delivered and installed the furnace in Pennsylvania; Ritchey regularly communicated with Mansell via Zoom,

26

telephone, and email regarding work progress; during negotiations, two Ritchey representatives visited Mansell's manufacturing plant in Alabama to inspect Mansell's work, and one of the representatives negotiated the contract during the visit; and the execution of the Contract at issue in this case occurred in Alabama.

However, as reviewed the *Hydrokinetics* decision did not conclude the foregoing features bore no relevance to the minimum contacts inquiry. To the contrary, the court ruled those features considered singly, or in totality, did not evince the defendant purposefully availed itself of the disputed forum. This case exhibited features surpassing the circumstances in *Hydrokinetics*: the sole transaction at issue in this case involved the manufacture of an industrial furnace for specialized use, not the sale of commercial goods; Ritchey solicited Mansell at its place of business in Alabama to manufacture the furnace; and Ritchey agreed via contract that the law of the forum state, Alabama, governs the agreement. Unlike the Fifth Circuit's ruling on the totality of the circumstances in *Hydrokinetics*, the totality of the features in this case, including the foregoing components distinguishing this case from *Hydrokinetics*, portrays Ritchey purposely availed itself of the Alabama forum.

In sum, the decisions relied upon by Ritchey do not command a deviation from the assessment discussed previously. *See Techjet Innovations Corp. v. Benjelloun*, 203 F. Supp. 3d 1219, 1228 (N.D. Ga. 2016) ("[W]hile the facts of this case do not neatly line up with any of the cases discussed above, they bear something in common with each of them and, in the aggregate, convince the [c]ourt that jurisdiction is appropriate.").

27

To recount, Ritchey initiated contact with Mansell; during negotiations, two Ritchey representatives visited Mansell's manufacturing plant in Alabama to inspect Mansell's work and conduct further negotiations; Ritchey signed a contract governed by Alabama law and delivered it to Mansell for execution in Alabama; Ritchey mailed payments to Mansell in Alabama; and Ritchey regularly communicated with Mansell via Zoom, telephone, and email.  *See Comm'n Equip.*, 498 F. Supp. at 635 (finding minimum contacts existed where "[the defendant] made the initial contact with [the plaintiff]; [the defendant] then engaged in lengthy bilateral contract negotiations with [the plaintiff] regarding the sale of a complicated telephone system; following these negotiations, one of the defendant's agents visited [the] plaintiff's manufacturing plant in Alabama, inspecting plaintiff's manufacturing facilities, and while there took part in further discussions regarding the contract"); *cf. Walden*, 571 U.S. at 288-89 (finding no minimum contacts existed where "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone" to the forum state).

Thus, based on the totality of the circumstances, Ritchey has engaged in the affirmative, purposeful activity necessary to establish minimum contacts with Alabama.

### B.    Mansell's Claim Relates to Ritchey's Contacts with Alabama

Another requirement for the exercise of specific personal jurisdiction dictates "[t]he plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." *Ford Motor*, 141 S. Ct. at 1025 (quoting *Bristol-Myers*, 137 S. Ct. at 1780). Chronicled interchangeably, "there must be 'an affiliation between the forum and the

underlying controversy, principally, [an] activity or an occurrence that takes place in the

forum State and is therefore subject to the State's regulation.'" *Id.* (alteration in original)

(internal quotation marks omitted) (quoting *Bristol-Myers*, 137 S. Ct. at 1780).

Nevertheless, the Court emphasizes the "most common formulation of the rule

demands that the suit 'arise out of or *relate* to the defendant's contacts with the forum.'"

*Id.* (emphasis in original) (quoting *Bristol-Myers*, 137 S. Ct. at 1780) (citation omitted).

The Supreme Court rejects a "causation-only approach" to establish a

"'connection' between a plaintiff's suit and a defendant's activities." *Id.* at 1026 (citing

*Bristol-Myers*, 137 S. Ct. at 1776).   "None of [the Court's] precedents has suggested that

only a strict causal relationship between the defendant's in-state activity and the

litigation will do." *Id.* ("[W]e have never framed the specific jurisdiction inquiry as

always requiring proof of causation—i.e., proof that the plaintiff's claim came about

because of the defendant's in-state conduct." (citing *Bristol-Myers*, 137 S. Ct. at 1780-

81)).

To the contrary, while "[t]he first half of the standard asks about causation," "the

back half, after the 'or,' contemplates that some relationships will support jurisdiction

without a causal showing." *Id.*  To be sure, assessing the "relate to" alternative of the

"connection" standard "does not mean anything goes"; "the phrase 'relate to'

incorporates real limits, as it must to adequately protect defendants foreign to a forum."

*Id.*  Nonetheless, even if a causal test would put jurisdiction in one particular forum, a

different State may also have jurisdiction "because of another 'activity [or] occurrence'

involving the defendant that takes place in the State." *Id.* at 1026-27 (alteration in original) (quoting *Bristol-Myers*, 137 S. Ct. at 1780-81).

Mansell's claims in the amended complaint both arose out of and relate to Ritchey's contacts with Alabama. The Contract at issue underlies Mansell's request for declaratory relief, in particular whether either party breached the terms of the agreement. But for Ritchey's contacts with Alabama—Ritchey's solicitation for a contact with Mansell; Ritchey inspecting Mansell's facility and an exemplar furnace, and negotiating the terms of a contract while in Alabama for the inspection; and Ritchey signing a contract governed by Alabama law and delivering it to Mansell in Alabama for execution—the contractual relationship underlying the parties' dispute would not have ensued. Therefore, Ritchey's connection with the forum culminating in the formation of a contractual relationship governed by Alabama law establishes this dispute arises out of, and relates to, Ritchey's purposeful availment of the forum.

## C. The Court's Putative Exercise of Personal Jurisdiction Would Comport with Traditional Notions of Fair Play and Substantial Justice

In addition to minimum contacts and a sufficient nexus, "the exercise of jurisdiction must also comport with traditional notions of fair play and substantial justice." *Diamond Crystal*, 593 F.3d at 1274 (citing *Burger King*, 471 U.S. at 476).

> In this analysis, [courts must] look to "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several states in furthering

30

fundamental substantive social policies.'"   [*Burger King*, 471 U.S. at 477]
(quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S.Ct. at 564).

*Id.*   As declared previously, however, because Mansell has discharged its burden of establishing the minimum contacts necessary to create specific jurisdiction and a sufficient connection between those contacts and the litigation, Ritchey sustains the burden to exhibit a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice. *Diamond Crystal*, 593 F.3d at 1267.

As an initial matter, Ritchey does not contend litigating in Alabama would be a burden. *Louis Vuitton*, 736 F.3d at 1358 (finding specific jurisdiction where, *inter alia*, "[the defendant] [did] not offer[] any evidence of his finances or any other limitations on him to show that he would be burdened by having to litigate the case in [the forum state].");  *Diamond Crystal*, 593 F.3d at 1274 (same); *see also Sloss*, 488 F.3d at 933-34 ("Alabama is, of course, the most convenient forum for [the plaintiff].  It is certainly inconvenient for [the defendant] to defend a suit in Alabama, but it would be just as difficult for [the plaintiff] to have to litigate in France.").  Indeed, Ritchey's actions in visiting the forum for a facility inspection demonstrates its willingness to travel to Alabama if the necessity arises.  And as a related element, Mansell's interest in obtaining convenient and effective relief tips in favor of Alabama, its preferred forum.

As for the second afore-cited element, Ritchey highlights Pennsylvania's "overriding, compelling" interest in adjudicating the dispute, and it downplays Alabama's interest.  (Doc. 11 at 15-16).  However, the element at issue does not query

which State possesses the predominant interest. Rather, it probes whether the disputed forum State sustains an interest in adjudicating the dispute. Surely Alabama sustains an interest in this litigation, as it concerns the quality of an industrial piece of equipment manufactured in the forum. Furthermore, given that the Contract contains a choice of law clause in favor of Alabama, it would not be "constitutionally unreasonable to hale [Ritchey] into federal court in Alabama." *Sloss*, 488 F.3d at 934. Along with the choice of law clause, that the execution of the Contract occurred in Alabama buttresses Alabama's interest in adjudicating this action. *Sw. Offset*, 622 F.2d at 152 ("[The plaintiff] proved that the contracts were made in Texas and would be governed by Texas law and thus that Texas has an interest in providing a forum for this suit.").

In assessing the fourth element, Ritchey contends "the most efficient resolution of this controversy lies in adjudicating its Pennsylvania Complaint in the Western District of Pennsylvania because that case is an action at law, rather than one at equity." (Doc. 11 at 15-16). First, of course, a declaratory judgment action does not constitute a suit in equity; it exists to declare issues of law as to a dispute between parties, regardless whether the matter concerns law or equity. More concretely, Ritchey's efficiency concerns in this regard falter because it would "have the opportunity to fully litigate [any] counterclaim for damages" in this action. *Aflac*, 978 F. Supp. 2d at 1315. Furthermore, Ritchey has not demonstrated this court cannot afford the relief it seeks in the Western District of Pennsylvania action. *See id.* (holding defendant "failed to

demonstrate how the relief available in this action is significantly different than the relief available in Texas").

Finally, Ritchey has not lodged any consideration of the element regarding the 'shared interest of the several states in furthering fundamental substantive social policies.' As such, this factor favors Mansell as Ritchey ostensibly could not delineate any "clash of the [Alabama] forum's law with the 'fundamental substantive social policies'" of Pennsylvania. *Burger King*, 471 U.S. at 477 (footnote omitted).

Based upon the foregoing review, Ritchey has not presented a "compelling case" that exercising personal jurisdiction in Alabama would be unconstitutionally unfair. Therefore, the court finds that it may exercise specific jurisdiction over Ritchey.[9]

## II.  MANSELL PRESENTS A JUSTICIABLE DECLARATORY JUDGMENT ACT CLAIM

The amended complaint portrays requests for declaratory relief under both the Alabama Declaratory Judgment Act ("ADJA"), Ala. Code 1975 § 6-6-220, and the federal Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. (Doc. 9 at ¶ 23). Because this court has subject matter jurisdiction based on diversity, the court must determine whether both acts apply to this action. "Under the [*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)] doctrine, federal courts apply state substantive law and federal procedural law."

---

[9] Of course, that the court properly maintains personal jurisdiction over Ritchey does not indicate this tribunal represents the appropriate forum for adjudicating the parties' dispute. In one respect, "to the extent that it is inconvenient for a party who has minimum contacts with a forum to litigate there, such considerations most frequently can be accommodated through a change of venue." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 483-84 (1985).

*Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 416 (1996).  The federal Declaratory Judgment Act constitutes a procedural rule, as state substantive law supplies the rules of decision applicable to the underlying claims in this diversity action.

Therefore, a district court applies the federal DJA rather than state declaratory judgment acts when proceeding in a diversity action seeking declaratory relief.  *See Manuel v. Convergys Corp.*, 430 F.3d 1132, 1138 n.3 (11th Cir. 2005) (citing *GTE Directories Publ'g Corp. v. Trimen Am., Inc.*, 67 F.3d 1563, 1567 (11th Cir. 1995) (noting that the DJA "does not enlarge the jurisdiction of the federal courts but rather is operative only in respect to controversies which are such in the constitutional sense. . . . Thus the operation of the [DJA] is procedural only." (first alteration in original) (internal quotation marks omitted))); *see also Coccaro v. Geico Gen. Ins. Co.*, 648 F. App'x 876, 881 (11th Cir. 2016) (per curiam) ("Because the Florida Declaratory Judgment Act is procedural as opposed to substantive, the district court did not err in construing the Coccaros' cause of action as a claim for declaratory and injunctive relief brought under 28 U.S.C. § 2201 exclusively."); *MacMillan-Bloedel, Inc. v. Firemen's Ins. Co. of Newark, N.J.*, 558 F. Supp. 596, 598 (S.D. Ala. 1983) ("In a declaratory judgment action where jurisdiction is based solely on diversity the question of whether a justiciable controversy exists within the purview of the Declaratory Judgment Act, 28 U.S.C.A. § 2201 (West 1982), is to be determined by federal law. The court, however, will apply the law of the forum state in resolving the substantive, non-federal issues."); *Snow v. King*, No. 4:17-CV-1048-VEH, 2018 WL 656032, at *9 (N.D. Ala. Feb. 1, 2018) ("Although the <u>federal</u>

Declaratory Judgment Act is the proper procedural vehicle when seeking declaratory relief in federal court, the same rules apply under the Alabama statutes." (emphasis in original) (citations omitted)).  Thus, the court will apply the DJA.

Ritchey contends Mansell's declaratory judgment action represents a "preemptive strike . . . seek[ing] declarations that it has a viable defense to a lawsuit that . . . had not been filed" yet.  (Doc. 17 at 2).  Formulated differently, Ritchey posits Mansell filed an "anticipatory" declaratory judgment action that only asserts "anticipatory defenses."  (*See* doc. 11 at 16-19; doc. 17 at 8-11).  Most concretely, Ritchey's argument devolves to whether Mansell's action impermissibly seeks an "advisory opinion," and thus, whether a justiciable controversy exists.  (Doc. 11 at 18).  As the following analyses portray, Ritchey has presented an actual controversy for adjudication under the DJA.

"The Declaratory Judgment Act provides that, '[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'"  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (alterations in original) (quoting § 2201(a)).  The Supreme Court holds "that the phrase 'case of actual controversy' in the [DJA] refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."  *Id.* at 126-27 (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)).  The court summarized that "[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show

that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127 (footnote and internal quotation marks omitted) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Federal courts have long accepted jurisdiction and applied the DJA where "the plaintiff's self-avoidance of imminent injury is coerced by threatened enforcement action of a private party." *MedImmune*, 549 U.S. at 773 (citations omitted). In doing so, "federal courts . . . often look to the 'character of the threatened action.'" *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 197 (2014) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 248 (1952)). "The determination of whether an actual case or controversy exists is determined on a case-by-case basis." *GTE Directories*, 67 F.3d at 1567; *see also Maryland Casualty*, 312 U.S. at 273 ("The difference between an abstract question and a 'controversy' contemplated by the [DJA] is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.").

In this action, Ritchey sent Mansell a demand letter, dated August 1, 2022, stating Mansell had breached the Contract and Ritchey suffered damages as a result of the alleged breach. (*See* doc. 9-2). The letter declared, "As a final effort to provide Mansell with an amicable solution to fix this problem before [Ritchey] results to significant legal action, [Ritchey] has authorized the following offer to resolve all issues." (*Id.* at 9). Ritchey's counsel requested Mansell contact him prior to August 10, 2022, to discuss

resolution options.  (*Id.* at 10).  The letter concluded that if Mansell "points fingers" or suggests "lame" defenses to justify its conduct, Ritchey would "end informal negotiations" and "precipitate the filing of a lawsuit against Mansell."  (*Id.*).  Based on the foregoing facts, the court finds that a justiciable controversy exists.

To satisfy the "actual controversy" requirement for a declaratory judgment action, "there must be a substantial continuing controversy between two adverse parties" based upon the facts alleged.  *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999) (citation omitted).  "The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred. Additionally, the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Id.* (citation omitted); *see also Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1357 (11th Cir. 2021) ("[I]f a plaintiff seeks *prospective* relief, such as a declaratory judgment, he must 'allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future.' . . . And that future injury must be 'real,' 'immediate,' and 'definite.'" (emphasis in original) (quoting *Malowney*, 193 F.3d at 1346-47)).

The foregoing facts portray that at the time Mansell filed this action, there existed a substantial continuing controversy between the parties based upon the alleged problems with the furnace.  Indeed, Ritchey threatened litigation if Mansell failed to ameliorate the alleged defective conditions.  As a result of the litigation threat, Mansell faced a substantial likelihood of a future injury, principally the specter of an adverse

judgment levied in any action filed by Ritchey.  Therefore, an actual controversy existed at the time Mansell filed this declaratory judgment action.  *See Medtronic*, 571 U.S. at 198-99 (finding a justiciable controversy existed where a patentee *could* have filed suit against a patent licensee if the licensee acted on its beliefs—that no infringement existed—by not paying royalties, notwithstanding that the licensee's declaratory judgment action avoided the "hypothetical threatened action"); *MedImmune*, 549 U.S. at 128 (finding a justiciable controversy existed where a patent licensee faced the threat of suit if it ceased making payments under a license agreement, notwithstanding that the licensee's continued royalty payments rendered the prospect of such a suit "remote, if not nonexistent"); *Manuel*, 430 F.3d at 1137 (rejecting the proposition that a district court must dismiss a declaratory judgment action "when the action was filed in apparent anticipation of another proceeding"); *McDougald v. Jenson*, 786 F.2d 1465, 1481 (11th Cir. 1986) ("We have stated that the Declaratory Judgment Act and [Federal Rule of Civil Procedure] 57 should be liberally construed to achieve the objectives of the declaratory remedy. . . . Those objectives include affording one threatened with liability, but otherwise without a satisfactory remedy, an early adjudication of an actual controversy, and avoiding multiplicity of actions by affording an adequate and expedient means of declaring the rights and obligations of litigants in one action rather than several." (citations omitted)).

There exists scant merit to Ritchey's contention that this action merely anticipates a defense.  As the amended complaint depicts, Mansell's suit necessarily

engages all the issues inherent in whether the parties respectively breached the Contract. *See MedImmune,* 549 U.S. at 127 n.7 ("The dissent asserts . . . that 'the declaratory judgment procedure cannot be used to obtain advanced rulings on matters that would be addressed in a future case of actual controversy.' As our preceding discussion shows, that is not so. If the dissent's point is simply that a defense cannot be raised by means of a declaratory judgment action where there is no 'actual controversy' or where it would be 'premature,' phrasing that argument as the dissent has done begs the question: whether this is an actual, ripe controversy."); *Hanes Dye & Finishing Co. v. Caisson Corp.*, 309 F. Supp. 237, 241 (M.D.N.C. 1970) ("While it is a well recognized principle that a declaratory judgment action may not be brought to determine the sufficiency of a defense to a possible suit, a distinction must be drawn between the anticipation of a mere defense and the anticipation—by bringing forth all the issues for a present determination—of the suit itself." (citing *Aetna Cas. & Sur. Co. v. Yeatts*, 99 F.2d 665, 669 (4th Cir. 1938)). Indeed, because Ritchey could "fully litigate its counterclaim for damages in this action," this suit would resolve all issues between both parties. *Aflac*, 978 F. Supp. 2d at 1314.

And the court finds Ritchey's argument that Mansell seeks declaratory relief for past conduct unpersuasive. To be sure, past injuries do not "support a finding of an Article III case or controversy when the only relief sought is a declaratory judgment." *Malowney*, 193 F.3d at 1348 (citing *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985) ("[A] declaration that the Florida post-judgment garnishment statute as applied in the

past to these plaintiffs is unconstitutional 'would [be] nothing more than a gratuitous comment without any force or effect.'" (alteration in original) (quoting *Northern Virginia Women's Medical Center v. Balch*, 617 F.2d 1045, 1049 (4th Cir. 1980)))).  As countenanced previously, however, Mansell posits a substantial likelihood of a future injury, i.e., the damages it may incur from an adverse judgment in Ritchey's threatened litigation.  *See GTE Directories*, 67 F.3d at 1567 (finding a controversy sufficiently real when a publisher wished to take particular course of action and a seller claimed that action would result in a lawsuit); *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 897 (5th Cir. 2000) ("The threat of litigation, if specific and concrete, can indeed establish a controversy upon which declaratory judgment can be based. . . . The fact that the filing of the lawsuit is contingent upon certain factors does not defeat jurisdiction over a declaratory judgment action." (citing, *inter alia*, *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 578 (7th Cir. 1994) (finding that once a buyer sent "notice letter" informing manufacturer that suit would be filed in state court if dispute was not resolved, disagreement was no longer an abstract question and therefore was ripe for adjudication); *Texas v. West Publ'g. Co.*, 882 F.2d 171, 176 (5th Cir. 1989) (finding that, in the intellectual property context, an actual controversy exists "(1) when the declaratory plaintiff has a real and reasonable apprehension of litigation and (2) when the declaratory plaintiff has engaged in a course of conduct that brings it into adversarial conflict with the declaratory defendant"))); 12 Moore's Federal Practice - Civil § 57.22 (2022) ("[D]eclaratory relief is appropriate when and only when one or both parties

have pursued a course of conduct that will result in imminent and inevitable litigation unless the issue is resolved by declaratory relief.  For example, a reasonable apprehension of being sued satisfies the actual controversy requirement . . . ." (footnotes omitted)); *c.f.*, *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 661 (1998) (holding that even if union's declaratory relief action presented federal question based on anticipated suit by employer over potential labor strike, case or controversy requirement was not met because union had never actually threatened to strike).

Thus, the court finds that an Article III "controversy" exists, and that Mansell stated a justiciable claim pursuant to the DJA.

## III.  THE NORTHERN DISTRICT OF ALABAMA QUALIFIES AS A PROPER VENUE

Ritchey contends the Northern District of Alabama constitutes an improper venue for this action.  A plaintiff need only present a prima facie showing that its chosen forum constitutes a proper venue.  *Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990) (quoting *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988)).   "A district court may decide whether a plaintiff's choice of forum is proper by reference to factual allegations made in the plaintiff's complaint . . . and the court need not conduct an evidentiary hearing."  *Goodwyn, Mills & Cawood, Inc. v. Black Swamp, Inc.*, 956 F. Supp. 2d 1323, 1326–27 (M.D. Ala. 2012) (citing *Home Ins.*, 896 F.2d at 1355).  "Further, '[t]he facts as alleged in the complaint are taken as true to

the extent they are uncontroverted by [the] defendant['s] affidavits." *Home Ins.*, 896 F.2d at 1355 (alterations in original) (quoting *DeLong Equip. Co.*, 840 F.2d at 845).

Title 28 U.S.C. § 1391, the general venue statue, provides that venue for a civil action may exist on the following bases:

> A civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(a).

"Section 1406(a) provides that '[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013) (alteration in original). This provision, along with Rule 12(b)(3), "authorize[s] dismissal only when venue is 'wrong' or 'improper' in the forum in which it was brought." *Id.*

Ritchey contends venue stands improper in the Northern District of Alabama because "an overwhelming super-majority of the alleged events or omissions" underlying this action occurred at its Pennsylvania facility, and the property at issue, the furnace, sits at its Pennsylvania facility as well. (Doc. 11 at 21). However, venue may

be proper in more than one federal district.  *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11ᵗʰ Cir. 2003).  And application of the principles lodged in the afore-cited decision, *Jenkins Brick*, establishes venue lies in the Northern District of Alabama pursuant to § 1391's transactional venue prong, i.e., a substantial part of the events or omissions giving rise to the breach-of-contract claim at issue occurred in this district.

In *Jenkins Brick*, the Court assessed the propriety of venue in two competing districts, the United States District Courts for the Southern District of Georgia and Middle District of Alabama, respectively.  *Id.*  at 1368-73.  The case involved the defendant's alleged breach of a non-compete provision in an employment contract, and the Middle District of Alabama determined venue did not lie in its district, and thus, transferred the case to the Southern District of Georgia.  *Id.* at 1368.  The Eleventh Circuit focused only upon "the events that directly give rise to a claim," and "only those locations hosting a 'substantial part' of the events."  *Id.* at 1371.

In finding that venue properly lay in the Southern District of Georgia, the Court found the following contractual events occurred exclusively in Georgia:  plaintiff presented the contract to defendant in Georgia; the defendant executed the contract in Georgia because he signed it there; the parties intended performance of the non-compete contract primarily in Georgia; and the defendant breached the contract in Georgia.  *Id.* at 1372.

The same considerations manifest in this case, portraying that a substantial part of the events and omissions leading to the breach-of-contract allegations arose in this

district.  As reflected previously, Ritchey presented the Contract for Mansell's signature in Alabama, and Mansell executed the Contract in Alabama because its representative signed it here.  And lest one contends otherwise, the execution of a contract constitutes a substantial event giving rise to a breach-of-contract claim.  The parties intended performance of a major aspect of the Contract in Alabama, i.e., the manufacture of the furnace.  And a substantial part of the omissions leading to the breach-of-contract claim arose in Alabama.  Indeed, Ritchey's demand letter complains about several alleged defects of the furnace that could have only, or at least predominantly, occurred during its manufacture in Alabama:  the size of the rotary; the faulty hood; the design defects in the conveyor; defects and other inherent problems with the burner; the failure of the furnace to melt aluminum; and critical rear gusset wear attributed to misalignment of rollers.  (Doc. 9-2 at 3-7).  The large majority of these alleged defects–indeed, near the entirety of them–stemmed from the manufacture of the furnace in Alabama according to Ritchey's contentions.  Therefore, venue properly lies in this district because a substantial part of the omissions underlying the breach-of-contract allegations occurred in this district pursuant to Ritchey's position.

In the alternative, even if this court may not exercise venue pursuant to § 1391(a)(2), it may properly do so pursuant to § 1391(a)(3).  Section 1391(a)(3) provides that venue lies in a district "in which any defendant is subject to the court's personal jurisdiction with respect to such action," if there exists no district in which an action may be brought under §§ 1391(a)(1) and (2).  To assess this provision vis-à-vis a

corporation, the court must determine whether the Northern District of Alabama possesses personal jurisdiction over Ritchey as if this district were a separate State. 28 U.S.C. § 1391(d). "The question to ask is whether the district the plaintiff chose has personal jurisdiction over the defendants, whether or not other forums had greater contacts." *Lisseveld v. Marcus*, 173 F.R.D. 689, 700 (M.D. Fla. 1997), *aff'd sub nom. Enviro Response v. Marcus*, 268 F.3d 1066 (11th Cir. 2001) (citing *Setco Enterprises Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994)); *see also Morgan v. N. MS Med. Ctr., Inc.*, 403 F. Supp. 2d 1115, 1122 (S.D. Ala. 2005), *aff'd sub nom. Morgan v. N. Mississippi Med. Ctr., Inc.*, 225 F. App'x 828 (11th Cir. 2007) ("Indeed, under § 1391 a plaintiff does not have to select the venue with the most substantial nexus to the dispute.").[10]

The court has already determined that Ritchey's contacts with Alabama—initiating contact with Mansell, visiting Mansell's manufacturing plant and negotiating the contract during the visit, delivering the contract to Mansell for execution, mailing payments to Mansell, and communicating with Mansell via Zoom, telephone, and email—subjected it to specific personal jurisdiction in Alabama. All of those contacts occurred in Colbert County, which lies within the Northern District of Alabama. Therefore, if the Northern District of Alabama were a separate State it would possess specific personal jurisdiction over Ritchey, and thus, proper venue lies in this district

---

[10] "[W]hen more than one proper venue is available under the applicable venue statute, the plaintiff is entitled to choose the location in which to file. A plaintiff is not obligated to file an action in the most convenient forum, only in a proper forum." 17 Moore's Federal Practice - Civil § 110.01 (2022).

pursuant to § 1391(a)(3).  That a substantial part of the events or omissions underlying the breach-of-contract claim also occurred in Ritchey's Pennsylvania facility, and the furnace presently sits there as well, "do not render venue improper in this district." *Hartford Cas. Ins. Co. v. Sany Am., Inc.*, 991 F. Supp. 2d 1303, 1307 (N.D. Ga. 2014).[11] "Where more than one district is potentially a proper forum, the court is not required to determine the 'best' venue." *Lisseveld*, 173 F.R.D. at 700 (citing *Setco Enterprises*, 19 F.3d at 1281).

## IV.   CONSIDERATION OF SEVERAL FACTORS WARRANTS DISMISSAL OF THIS CASE TO PERMIT ADVANCEMENT IN THE WESTERN DISTRICT OF PENNSYLVANIA

In its motion, Ritchey seeks venue transfer of this civil action to the Western District of Pennsylvania pursuant to 28 U.S.C. § 1404.  Mansell's motion seeks application of the first-filed rule to maintain the action in this district, but Ritchey counters that the venue transfer factors evince compelling circumstances warranting an exception to the first-filed rule.  The court concludes the various applicable considerations merit dismissal of this action in favor of the pending action in the Western District of Pennsylvania.

The governing legal principles for the parties' entreaties coalesce somewhat. Mansell's request invokes the first-filed rule because this action preceded Ritchey's filing

---

[11] *See also McCants v. Alabama-W. FL Conf. of the United Methodist Church, Inc.*, No. CIVA 08-0686-KD-C, 2009 WL 1537868, at *2 (S.D. Ala. June 1, 2009), *aff'd sub nom. McCants v. Alabama-W. Fla. Conf. of United Methodist Church, Inc.*, 372 F. App'x 39 (11ᵗʰ Cir. 2010) ("Asserting that venue is proper in another location does not render venue improper in the location selected by [the plaintiff].").

of its action in the Western District of Pennsylvania.  The first-filed rule provides that "when parties have instituted competing or parallel litigation in separate courts, the court initially seized of the controversy should hear the case." *Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.*, 713 F.3d 71, 78 (11th Cir. 2013) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 675 F.2d 1169, 1174 (11th Cir. 1982)); *see also Manuel*, 430 F.3d at 1135 (citations omitted) ("Where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule."). "The first-filed rule not only determines which court may decide the merits of substantially similar cases, but also generally establishes which court may decide whether the second filed suit must be dismissed, stayed, or transferred and consolidated." *Collegiate Licensing*, 713 F.3d at 77 (citations omitted).

However, the rule permits the court fielding the first-filed case, in its discretion, to "decline to entertain a declaratory judgment action on the merits when a pending proceeding in another court will fully resolve the controversy between the parties." *Ven-Fuel, Inc. v. Dep't of the Treasury*, 673 F.2d 1194, 1195 (11th Cir. 1982) (dismissing a case without prejudice when the court found that circumstances warranted an exception to the first-filed rule).  The "party objecting to jurisdiction in the first-filed forum carr[ies] the burden of proving 'compelling circumstances' to warrant an exception to the first-filed rule." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005).

The first-filed rule constitutes a rule of equity, and "equitable considerations underlie any decision to find that an exception to the rule applies." *Guntersville Breathables, Inc. v. Twenty-Six Designs*, LLC, No. 4:21-CV-01543-ACA, 2022 WL 1179408, at *2 (N.D. Ala. Apr. 20, 2022) (citing *Collegiate Licensing*, 713 F.3d at 80; *Manuel*, 430 F.3d at 1135-36). "The range of considerations available to the district court in deciding whether to entertain the declaratory action despite the existence of a second-filed coercive action is vast and the deference afforded to its decision is substantial." *Id.* at *4 (cleaned up) (internal quotation marks omitted) (quoting *Manuel*, 430 F.3d at 1137-38).

In assessing whether compelling circumstances exist vis-a-vis declaratory judgment actions, "one equitable consideration . . . is whether the . . . action was filed in apparent anticipation of the other pending proceeding." *Id.* (alterations in original) (internal quotation marks omitted) (citations omitted). "In that circumstance, the 'first-filed' court can decline to invoke the first-filed rule to retain the strategically filed action." *Collegiate Licensing*, 713 F.3d at 79. "However, even if a court finds that a filing is anticipatory, such finding does not automatically compel abandoning the first-filed rule." *Id.* "Rather, the matter remains one of discretion for the trial court." *Id.*

Additional equitable factors include the same factors considered in a § 1404(a) venue transfer motion. *Manuel*, 430 F.3d at 1135 (footnote and citation omitted); *cf. Collegiate Licensing*, 713 F.3d at 79 ("[T]he Georgia district court properly found that the anticipatory suit exception to the first-filed rule does not apply and that the 28 U.S.C. §

48

1404 factors do not justify an exception to the first-filed rule."). Of course, that equitable assessment dovetails with Ritchey's entreaty for a venue transfer pursuant to § 1404.

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." Yet, "[t]he plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) (internal quotation marks omitted) (citation omitted). These considerations include:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel*, 430 F.3d at 1135 n.1.[12]

---

[12] Neither of the parties contend that the Western District of Pennsylvania lacks "personal and subject matter jurisdiction," and "proper venue," over this action. *Delorenzo v. HP Enter. Servs.*, LLC, 79 F. Supp. 3d 1277, 1280 (M.D. Fla. 2015) (citing *Miot v. Kechijian*, 830 F. Supp. 1460, 1465 (S.D. Fla. 1993)). Section 1404(a)'s "'might have been brought' language means that the proposed transferee district must be one in which the plaintiff properly could have filed the action initially. Accordingly, the transferor court may not transfer an action unless it first determines that, at the time the action was originally filed . . ., the transferee court would have had proper venue, subject matter jurisdiction, and personal jurisdiction over the parties." 17 Moore's Federal Practice - Civil § 111.12 (2022).

Clearly, if diversity subject matter jurisdiction does not lie in the Western District of Pennsylvania, then it fails in this action as well, but neither party raises such a contention. And personal jurisdiction does not pose an issue as well, as Pennsylvania exercises general personal jurisdiction over Ritchey (it remains a corporation organized under the laws of the State of Pennsylvania with its principal place

Along with the foregoing equitable and statutory considerations, the court's broad discretion to decline jurisdiction over declaratory judgement actions also should play a role in the court's determination:

> The Declaratory Judgment Act confers on federal courts a "unique and substantial discretion in deciding whether to declare the rights of litigants." [*Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)]. "The statute's textual commitment to discretion, and the breadth of leeway [the Supreme Court] has always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface." *Id.* at 286-87.
>
> The Declaratory Judgment Act has been characterized as an "enabling Act," giving the district courts discretion to grant a new form of relief. *Id.* at 287-88. The Act, however, confers no "absolute right upon the litigant" and imposes no duty on the district courts. Thus—even when a civil action satisfies federal subject matter jurisdictional prerequisites—a district court still maintains discretion about "whether and when to entertain an action under the Declaratory Judgment Act." *Id.* at 282; *see also Brillhart v. Excess Ins. Co. of Amer.*, 316 U.S. 491, 494 (1942) ("Although the District Court had jurisdiction of the suit under the Federal Declaratory Judgments Act, it was under no compulsion to exercise that jurisdiction."). "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288. And we must be mindful that the "facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within [the district court's] grasp." *See id.* at 289.

---

of business in Pennsylvania (doc. 9 at ¶ 6)), and surely Pennsylvania exercises specific personal jurisdiction over Mansell given its contacts and purposeful availment of the forum (i.e., delivering and installing an alleged defective furnace at Ritchey's Pennsylvania facility). And a substantial part of the events or omissions underlying the parties' dispute arises in Pennsylvania, i.e., the delivery, installation, and functioning of the furnace at Ritchey's facility. Therefore, venue does not pose a concern either for the Western District of Pennsylvania.

*Stevens v. Osuna*, 877 F.3d 1293, 1311-12 (11th Cir. 2017).[13]

Based upon the foregoing guiding principles and equitable factors, the court will dismiss this case to permit advancement of the coercive action in the Western District of Pennsylvania.  First, the facts demonstrate Mansell filed the declaratory judgment action at bar in anticipation of Ritchey filing its action in the Western District of Pennsylvania.  Ritchey sent Mansell a demand letter on August 1, 2022, indicating it would file suit in the Western District of Pennsylvania if discussions requested by August 10, 2022, failed to resolve their dispute.  (*See* doc. 9-2).  Mansell filed this suit in state court on August 12, 2022.  This sequence of events exhibits Mansell filed suit in anticipation of Ritchey's filing of suit in the Western District of Pennsylvania due to the parties' failure to resolve their dispute.  *See Guntersville Breathables*, 2022 WL 1179408, at *5 ("Guntersville filed this case as an improper anticipatory action. . . . [The facts] made clear that TSD intended to file a coercive lawsuit and that Guntersville was aware of that intention when Guntersville decided to file what was, at the time, an action only

---

[13] *See also James River Ins. Co. v. Rich Bon Corp.*, 34 F.4th 1054, 1059 (11th Cir. 2022) (The DJA "vests district courts with discretion to dismiss declaratory suits when, in their best judgment, the costs outweigh the benefits. Its language is spare, but direct: federal courts '*may* declare the rights and other legal relations of any interested party seeking such declaration.' 28 U.S.C. § 2201(a) (emphasis added). The Act thus makes an explicit 'textual commitment to discretion.'. . . So while federal courts normally have an 'unflagging obligation' to exercise our jurisdiction, where declaratory judgments are concerned this imperative 'yields to considerations of practicality and wise judicial administration.'" (citation omitted)); *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1251 (11th Cir. 2019) ("Overturning a district court's denial of declaratory relief, even at the motion to dismiss stage requires a heavy lift. Not only do we review this matter only for abuse of discretion, but the district court's initial decision has an explicitly wide range of discretion. District courts have 'broad statutory discretion to decline declaratory relief.'. . . Reposing broad discretion in the district courts is wholly consonant with the purposes of declaratory relief." (citation omitted)).

for declaratory judgment. . . . The court finds this to be a compelling factor. Fear of the other party filing an anticipatory action can easily prompt a party with a dispute to rush to the courthouse instead of raising, discussing, and resolving issues outside the court system. This imposes a burden not only on the specific parties to any given dispute, but also on the court system as a whole.").

The § 1404(a) factors also weigh in favor of dismissing this case and permitting advancement of the Western District of Pennsylvania action. To be sure, at first blush several of the factors indicate this district may be a more convenient forum, namely the convenience of the witnesses; the location of relevant documents and the relative ease of access to sources of proof; the locus of operative facts; and the forum's familiarity with the governing law. These factors preliminarily favor this district because Mansell designed and manufactured the furnace here, and thus, access to the designers, the documents underlying the design, and review of the manufacturing process appear to be more convenient here. These considerations may be overblown, however, when one presumes the design documents exist in a form easily transmissible electronically, and Ritchey may take depositions of the furnace's designers even if the action proceeds in Pennsylvania. The only factor that principally weighs in favor of Mansell constitutes this forum's familiarity with Alabama law, which the undersigned diminishes with the observation federal judges are deemed competent in the assessment and application of law generally.

In contrast, the § 1404 factors largely favor advancement of the Western District of Pennsylvania action, particularly the convenience of the witnesses; the location of relevant documents and the relative ease of access to sources of proof; the locus of operative facts; the weight accorded a plaintiff's choice of forum; and trial efficiency and the interests of justice.  First, and importantly, the alleged, defective furnace sits in the Western District of Pennsylvania, not this district.  The examinations of the furnace by the parties, any experts retained by the parties, and the trial factfinders, would all occur in Pennsylvania, not here.

Moreover, Mansell avers in its amended complaint that the furnace's faulty operation results from the "poor condition" of "Ritchey's building and facility where the Furnace was installed," including its lack of cleanliness and maintenance," and "Ritchey refused to make repairs and improvements to the building and facility, as Mansell repeatedly advised." (Doc. 9 at ¶ 14).  Later in the amended complaint, Mansell requests a declaration that "Ritchey failed to properly maintain and operate the Furnace and [Ritchey's] surrounding building and facility." (*Id.* at 8).  Indeed, prior to execution of the Contract a Mansell representative highlighted Mansell's experience in designing and installing aluminum-melting furnaces at facilities similar to Ritchey's factory, (doc. 9-2 at 2-3), and the Mansell representative conducted two diligence visits at Ritchey's factory – in 2018 and 2020 – during which the representative walked the facility, took measurements, examined the area where the furnace would operate, and met with several Ritchey employees and agents. (*Id.* at 3).  In addition, at Ritchey's facility Mansell

representatives "instructed and showed" Ritchey personnel in "detail" as to the proper operation and maintenance of the furnace. (Doc. 9 at ¶ 13).

The foregoing facts demonstrate Mansell's extensive engagement at Ritchey's facility, including its inclination to travel to Pennsylvania to ostensibly effect proper assessment of the facility for design, construction and installation of the furnace, and subsequently, resolution of the problems Ritchey experienced with the furnace. Equally important, these facts underscore the necessity to examine Ritchey's facility and the site conditions regarding the furnace's installation. Surely, the convenience of conducting such an examination during discovery and at trial favors advancement of this suit in the Western District of Pennsylvania when invoking considerations of "practicality and wise judicial administration." *Wilton*, 515 U.S. at 288.

Furthermore, the afore-assessed anticipatory litigation factor coalesces with the weight accorded a plaintiff's choice of forum. The facts indicate Mansell filed this declaratory judgment action to forestall Ritchey's anticipated coercive suit in the Western District of Pennsylvania. In essence, Mansell seeks to preclude Ritchey's choice of forum as the plaintiff in the coercive suit, an anticipatory choice which generally should hold sway over the choice expressed by a declaratory judgment plaintiff who would be the defendant in the putative coercive suit. *See Melamed v. Blue Cross of California*, 470 F. App'x 830, 832 (11th Cir. 2012) ("We have held that, 'in its discretion, a district court may decline to entertain a declaratory judgment action on the merits when another proceeding will fully resolve the controversy between the parties.'

Similarly, the district court's reason not to entertain this declaratory judgment action--it involved the same issues as WellPoint's motion to enforce the MDL 1334 settlement--was well within the 'range of considerations available' to it when deciding whether to entertain a declaratory action." (cleaned up) (quoting *Ven–Fuel, Inc. v. Dep't of Treasury*, 673 F.2d 1194, 1195 (11th Cir. 1982))).

In sum, because a parallel action in the Western District of Pennsylvania will more conveniently resolve the dispute between the parties in the interests of justice and equity, compelling circumstances warrant the exercise of discretion to dismiss this declaratory judgment action as an exception to the first-filed rule.

## CONCLUSION

For the reasons stated herein, the court will **DENY** Ritchey's motions to dismiss and transfer this case.  (Doc. 11).  Moreover, the court will **DENY** Mansell's motion to stay, or alternatively, transfer the Western District of Pennsylvania case to this district.  (Doc. 15).  Rather, the court will **DISMISS** this case without prejudice.

**DONE** and **ORDERED** this 20th day of January, 2023.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE